**IT IS ORDERED as set forth below:**



**Date: August 7, 2020**

_Wendy L. Hagenau_

_____
**Wendy L. Hagenau
U.S. Bankruptcy Court Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 15-58443-WLH |
| NILHAN DEVELOPERS, LLC, | CHAPTER 11 |
| Debtor. | |

## <u>AMENDED AND RESTATED ORDER ON CLAIM OF NORCROSS HOSPITALITY</u>

The Court entered an Order on the Claim of Norcross Hospitality on July 31, 2020 (Case No. 15-58443 Doc. No. 158). The Court now amends and restates the Order, supplementing its analysis under part IV of the Order.

1

**THIS MATTER** is before the Court on Norcross Hospitality's Motion for Allowance and Payment of Administrative Expense Claim or, in the Alternative, for Nunc Pro Tunc Approval of Post-Petition Financing (Case No. 15-58440 Docs. Nos. 1182 and 1439) (the "Motion").[1] Norcross Hospitality seeks allowance and payment of an administrative expense claim in this case in the principal amount of $5,169,212.32 plus interest at the rate of 12 percent.

Norcross Hospitality is an insider of Nilhan Developers LLC ("the Debtor") and extended over $5 million of unauthorized post-petition financing to the Debtor. Whether its claim is allowed, and in what manner and priority, will affect the Debtor's estate and other creditors. If the Norcross Hospitality Claim is disallowed or subordinated to the claims of other creditors, all creditors will be paid in full. If it is allowed, either as an administrative claim or general unsecured claim sharing with other claimants, with or without interest, the creditors' claims will not be paid in full. Norcross Hospitality argues, however, there would be no funds to distribute to creditors if Norcross Hospitality had not provided funding to the Debtor to repurchase certain real property which the Chapter 11 Trustee ultimately sold during this case.

## I. **Facts**

The facts are not in dispute and many are set out in the Joint Stipulation of Undisputed Facts (Case No. 15-58443 Doc. No. 131). The Debtor, together with its affiliates, Bay Circle Properties, LLC ("Bay Circle"), DCT Systems Group, LLC ("DCT"), Sugarloaf Centre, LLC ("Sugarloaf"), and NRCT, LLC ("NRCT") (collectively the "Debtors"), each filed a petition for relief under Chapter 11 of the Bankruptcy Code on May 4, 2015. On June 8, 2015, the Court

---

[1] The bankruptcy cases of the Debtors Bay Circle Properties, LLC, DCT Systems Group, LLC, Sugarloaf Centre, LLC, Nilhan Developers, LLC, and NRCT, LLC were jointly administered under case no. 15-58440-WLH (Case No. 15-58440 Doc. No. 38). On May 5, 2020, the Court entered an order converting the case of Bay Circle Properties, LLC to Chapter 7 (Case No. 15-58440 Doc. No. 1420). As a result, this case was severed from joint administration and all pleadings and other papers regarding Nilhan Developers have since been filed in case no. 15-58443-WLH.

administratively consolidated the Debtors' cases. The manager of each of the Debtors is Chuck Thakkar. Ownership in each debtor differs somewhat but in general in each debtor, ownership is held by some combination of Mr. Thakkar, his children Rohan and Niloy, his wife, or a company which some combination of Thakkars owns. The history of these cases is quite lengthy. The immediate reason for the bankruptcy filing was a default by the Debtors under certain obligations to Wells Fargo Bank, N.A. The obligations were secured by various pieces of real property owned by the Debtors.[2]

Nilhan Developer's Schedules reflect it owned certain real estate located at 2800 and 2810 Spring Road, Smyrna, Georgia known as Emerson Center. The property located at 2800 Spring Road was identified as a shopping center consisting of 1.56 acres. The property identified as 2810 Spring Road was described as office suites consisting of three buildings on 7.14 acres (2810 Spring Road; together with 2800 Spring Road, collectively the "Property"). The Property is located in the general vicinity of the park where the Atlanta Braves play.

The Property was collateral for the Wells Fargo obligations. Wells Fargo, the Debtors, and other non-debtor entities including Chuck, Niloy, and Rohan Thakkar executed a Settlement Agreement on November 18, 2015 in which Wells Fargo agreed to forbear from enforcing obligations and performance owed by the Debtor and other loan parties (the "Settlement Agreement"). The Settlement Agreement was amended on January 8, 2016 and approved by the Court on January 13, 2016 (Case No. 15-58440 Doc. No. 302). The Settlement Agreement required the full amount of the debt to Wells Fargo to be paid by April 30, 2017 and set various

---

[2] Wells Fargo Bank, N.A. began its association with the Debtors in 2008. The history is set out in several prior orders issued by the Court, including the Order Denying Substantive Consolidation (Case No. 15-58440 Doc. No. 797). In short, Wells Fargo, the Debtors, and related entities executed a series of promissory notes pursuant to which the Debtors guaranteed the obligations and the indebtedness owed under the notes. The obligations were secured by collateral including real and personal property owned by the Debtors. In April 2015, Wells Fargo sent a notice to all obligors accelerating the maturity of all amounts due and stating it intended to foreclose on real property collateral on May 15, 2015. The notice precipitated the Debtors' bankruptcy filings.

deadlines for interim payments and release prices for the collateral.  The release price for the Property was $5.2 million.  If Wells Fargo was not paid in full by April 30, 2017, it could record deeds-in-lieu of foreclosure on the Debtor's Property and property of the other obligors without further hearing.  After the Settlement Agreement was finalized and approved, Wells Fargo assigned its interest and claim to Bay Point Capital Partners, L.P. ("Bay Point").

In April 2017, as the deadline to pay Wells Fargo neared, Debtor sought to sell the Property to Westplan Investors Acquisitions, LLC ("Westplan") or its assignee for $7 million free and clear of all liens, claims and encumbrances, and to remit the net sale proceeds to Bay Point (Case No. 15-58440 Doc. No. 634).  The Debtor and Westplan had been in discussions going back to 2015 over joint development of the Property.  The proposal contemplated that the Debtor would have the right to develop the retail, office and hotel portion of the property under certain circumstances while Westplan would develop the residential portion of the property.  Paragraph 26 of the contract provided the Debtor the right to buyback all or a portion of the Property upon the occurrence of certain conditions, such as the failure of the City of Smyrna to rezone the Property to allow for the planned development.  Bay Point, Good Gateway, LLC and SEG Gateway, LLC objected to the sale.  Bay Point submitted a credit bid for the Property.  At the Court's direction, the parties conducted an auction, which resulted in an offer from Westplan of $7.2 million otherwise in accordance with the proposed contract and from Bay Point of $7.3 million otherwise in accordance with the proposed Westplan contract, but without the repurchase option for the Property.

The Court held an evidentiary hearing on the motion to sell at which Mr. Thakkar testified to his desire for the Debtor to retain the right to repurchase the property.  The Court found that the buy back option could have significant value if the Property was rezoned to accommodate residential and hotel use.  The Court noted the option was clearly important to Mr. Thakkar, and

4

ordered Mr. Thakkar, or a non-debtor party on his behalf, to contribute $100,000 at the closing such that the total proceeds paid to Bay Point would be $7,300,000. The Court authorized the sale of the Property to Westplan (Case No. 15-58440 Doc. No. 679).

Westplan assigned the right to purchase the Property to Accent Cumberland Apartments, LP ("Accent"). The sale closed and Accent applied for rezoning with Cobb County, but the rezoning request was denied. In a letter dated May 22, 2018, Accent notified the Debtor it had through August 20, 2018 to exercise an option to repurchase the Property for the price of $9,269,212.32 calculated in accordance with the contract. Debtor did not have sufficient funds to repurchase the Property at that time. The Debtor's Monthly Operating Reports show the Debtor had an ending cash balance for the month of May 2018 of just $25,742.58 and an ending cash balance in June and July 2018 of $24,983.58.

Without notifying or consulting with Debtor's bankruptcy counsel, Debtor sought financing to exercise the repurchase option. Mr. Thakkar, as manager of the Debtor, attempted to obtain financing from various lenders, but was unable to do so. Debtor ultimately succeeded in obtaining a loan from Rass Associates, LLC ("Rass") and executed a promissory note in the principal amount of $4,100,000 on August 20, 2018.[3] Debtor also executed a deed to secure debt in favor of Rass on the Property that was recorded in the Cobb County, Georgia property records on August 20, 2018.

Debtor was still short of funds. Mr. Thakkar turned to Norcross Hospitality, a company of which he was manager and his children Niloy and Rohan are the majority owners. He arranged for Norcross Hospitality to borrow $4,500,000 from Metro City Bank and then loan that money plus an additional $616,212.32 to the Debtor. On August 20, 2018 (post-petition), Debtor executed

---

[3] Rass is not related to the Debtor, and its manager and members are not affiliates or insiders of the Debtor.

a promissory note to Norcross Hospitality in the principal amount of $5,169,212.32 (the "Note"). The Note provided for interest at 12 percent and a maturity date of December 18, 2018. Debtor executed a deed to secure debt in favor of Norcross Hospitality, but the deed was never recorded. On August 20, 2018, the Debtor used the funds it obtained from Rass and Norcross Hospitality to repurchase the Property from Accent for $9,269,212.32.

It is undisputed that the Debtor never informed its counsel or the Court of its intent to borrow funds and exercise the option, nor sought nor obtained approval from the Court, to incur the post-petition financing from Rass or Norcross Hospitality or to purchase the Property. The Court learned the Property had been repurchased by the Debtor while reviewing Westplan's Motion to Dismiss a complaint filed by the Debtor against Westplan and Accent alleging breach of contract. The Court issued an Order to Show Cause (Case No. 15-58440 Doc. No. 894) on October 10, 2018 directing Debtor and its counsel to appear and explain to the Court the circumstances of the alleged repurchase. The Debtor, through counsel, filed a response on October 25, 2018 stating that the Property had no equity and in order for any value to be realized, zoning and development must occur. The Debtor contended that such could not occur in a bankruptcy case and proposed that the Property simply be transferred to Norcross Hospitality. Alternatively, the Debtor requested that the post-petition financing be approved. (Case No. 15-58440 Doc. No. 898). On November 11, 2018, the Debtor filed a Motion Requesting Entry of Order (1) Transferring or Assigning Real Property and Authorizing Assumption of Debt Obligations, or Alternatively, (2) Authorizing Post-Petition Financing Pursuant to Section 364 of the Bankruptcy Code Nunc Pro Tunc (Case No. 15-58440 Doc. No. 904). The Court did not immediately hear the motion; instead, after notice and a hearing, it appointed a Chapter 11 Trustee (Case No. 15-58440 Doc. No. 919).

6

The Chapter 11 Trustee sought to sell the Property and after an auction, ultimately sold it to Rass for $12,795,000, including a credit bid in the amount of $4,100,000 (the principal amount of Rass' post-petition loan to the Debtor). The Chapter 11 Trustee received net sales proceeds in the amount of $8,450,834.28. Rass and Norcross Hospitality filed motions to approve repayment of their debts. Rass filed its Motion for Allowance of Administrative Expense Claim (Case No. 15-58440 Doc. No. 1180), and the Court has approved a settlement allowing Rass an administrative expense claim in the amount of $404,260 for interest accrued at 10 percent on the principal amount of $4,100,000 from August 20, 2018 through August 16, 2019 (Case No. 15-58440 Doc. No. 1416).

Norcross Hospitality filed this Motion seeking *nunc pro tunc* approval and administrative expense treatment of the Note executed by the Debtor in favor of Norcross Hospitality. Norcross Hospitality filed an Addendum to the Motion (Case No. 15-58440 Doc. No. 1439) in which it clarified the relief it was seeking. The Chapter 11 Trustee filed a response in opposition to the Motion (Case No. 15-58443 Doc. No. 122). The parties filed supplemental briefs in support of their positions (Norcross Hospitality's reply is at Case No. 15-58443 Doc. No. 138; the Chapter 11 Trustee filed a supplemental response at Case No. 15-58443 Doc. No. 139). Good Gateway, LLC and SEG Gateway, LLC ("Gateway") and Douglas Menchise, Chapter 7 Trustee for the estate of Nilhan Financial, LLC (a creditor of the Debtor's and another entity affiliated with Mr. Thakkar whose bankruptcy case is pending in the Middle District of Florida) also filed papers in opposition to the Motion (Case No. 15-58440 Doc. No. 1427; Case No. 15-58443 Doc. No. 124, amended at Doc. No. 125).

The Court held an evidentiary hearing on the Motion on June 23, 2020. Counsel for Norcross Hospitality, Henry Sewell, and counsel for the Chapter 11 Trustee, Frank DeBorde and

7

Lisa Wolgast, appeared in person, while counsel for Niloy and Rohan Thakkar, John Moffa, and counsel for Gateway, Walt Jones, appeared by telephone. Eric Nathan, Ron Glass, and Chuck Thakkar testified. After hearing and receiving evidence and argument from counsel, the Court invited the parties to submit additional briefs and took the matter under advisement. Norcross Hospitality (Case No. 15-58443 Doc. No. 151), the Chapter 11 Trustee (Case No. 15-58443 Doc. No. 150), and Niloy and Rohan Thakkar (Case No. 15-58443 Doc. No. 152) filed supplemental briefs in support of their positions on July 10, 2020.

## II.  **Summary of Arguments**

Norcross Hospitality contends it is entitled to an administrative expense claim in the principal amount of $5,169,212.32, plus accrued and unpaid interest, because the financing was incurred in the ordinary course of business. Barring that, it argues the Court should exercise its equitable powers to approve its loan *nunc pro tunc*. Alternatively, it argues it is entitled to an administrative expense claim for making a substantial contribution or on equitable grounds. If the Court does not allow an administrative expense claim, Norcross Hospitality contends that it should be allowed an unsecured claim for the full amount of its claim and that its claim should not be recharacterized or subordinated; at a minimum, it should be paid *pari passu* with the claim of Nilhan Financial. Norcross Hospitality also contends interest should be allowed as an actual and necessary cost of administration.

The Chapter 11 Trustee contends Norcross Hospitality is not entitled to an administrative claim because the loan was not incurred in the ordinary course of business, *nunc pro tunc* approval is not warranted, and Norcross Hospitality does not have standing to seek a substantial contribution administrative expense claim under Section 503(b)(3)(D). The Chapter 11 Trustee contends treating Norcross Hospitality's claim as an administrative claim would confer an unfair advantage

8

on it.  The Chapter 11 Trustee contends that any claim of Norcross Hospitality should be recharacterized as equity.  In the alternative, the Chapter 11 Trustee asks the Court to exercise its discretion to treat Norcross Hospitality as having a general unsecured claim subordinate to claims held by general unsecured creditors.  The Chapter 11 Trustee contends, to the extent Norcross Hospitality's claim is allowed, interest should be disallowed, or interest should be treated as a general unsecured claim capped at the federal judgment interest rate.

Gateway argues Norcross Hospitality's claim is not entitled to an administrative priority because *nunc pro tunc* approval of the loan is not warranted.  Further, it argues Norcross Hospitality is not a creditor and should not be paid in the bankruptcy case even after all other unsecured creditors are paid.

Mr. Menchise contends Norcross Hospitality should not be paid through this bankruptcy case.  He contends Mr. Thakkar should not be rewarded for disregarding the Code and, if the Court is inclined to grant Norcross Hospitality a claim, it should be recharacterized and subordinated to all other claims in the case.  He also contends interest should be disallowed; if it is allowed, it should be assessed at the federal judgment rate.

### III.  Application for Administrative Priority Claim

The party claiming entitlement to an administrative expense priority has the burden of proof.  In re Concrete Prods., Inc., 208 B.R. 1000, 1006 (Bankr. S.D. Ga. 1996).  Priority claims are subject to close scrutiny.  Id.  The scrutiny becomes even greater when the claimant is an insider.  Id. (citing Pepper v. Litton, 308 U.S. 295, 308 (1939)).

An insider is an entity "whose close relationship with the debtor subjects any transaction made between the debtor and such entity to heavy scrutiny."  Miami Police Relief & Pension Fund

v. Tabas (In re The Fla. Fund of Coral Gables, Ltd.), 144 F. App'x 72, 75-76 (11th Cir. 2005).

Section 101(31) defines "insider" in an illustrative manner to include:

> (B) if the debtor is a corporation—
>    (i) director of the debtor;
>    (ii) officer of the debtor;
>    (iii) person in control of the debtor;
>    (iv) partnership in which the debtor is a general partner;
>    (v) general partner of the debtor; or
>    (vi) relative of a general partner, director, officer, or person in control of the debtor;
>    . . .
> (E) affiliate, or insider of an affiliate as if such affiliate were the debtor . . . .

11 U.S.C. § 101(31); see also Fla. Fund of Coral Gables, Ltd., 144 F. App'x at 75 (explaining the

list in Section 101(31) is not meant to be exhaustive).

> Section 101(2), in turn, provides an affiliate is, among other things,
>
> (B) [a] corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—
>
>> (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or
>>
>> (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote[.]

Id. Corporations with common ownership are affiliates and, therefore, insiders. Redmond v. Ellis

County Abstract & Title Co. (In re Liberty Livestock Co.), 198 B.R. 365, 371 (Bankr. D. Kan.

1996) (same individual was shareholder of both debtor and another corporation, which made the

other corporation an "affiliate" of the debtor and thus an "insider"); In re Lettick Typografic, Inc.,

103 B.R. 32, 38 n.7 (Bankr. D. Conn. 1989) (where both Chapter 11 debtor and another corporation

were wholly owned by debtor's sole shareholder, they were affiliates as defined in 11 U.S.C. §

101(2) and other corporation was an "insider"); In re TS Employment, Inc., 2015 WL 4940348

(Bankr. S.D.N.Y. Aug. 18, 2015) (where individual owned 100 percent of New York debtor and 89.7 percent of Delaware debtor, debtors were "affiliates").  A limited liability company can be an affiliate of a debtor because limited liability companies fall within the definition of "corporation" under Section 101(9).  <u>Sherron Assocs. Loan Fund XXI (Lacey) L.L.C. v. Thomas (In re Parks)</u>, 503 B.R. 820, 829 (Bankr. W.D. Wash. 2013).

Norcross Hospitality is an insider of the Debtor.  Norcross Hospitality is majority owned by the same individuals who own the Debtor and managed by the same individual—Mr. Thakkar —who managed the Debtor at the time of the transaction.  Accordingly, Norcross Hospitality's claim for an administrative expense must be carefully scrutinized.

A.    <u>The Transaction was Not in the Ordinary Course of Business</u>

The ability of a trustee or debtor-in-possession to incur unsecured debt allowed as an administrative expense under Section 503(b)(1) is governed by Sections 364(a) and (b) of the Code.  Section 364 covers all post-petition financing situations — those in and out of the ordinary course of business.  <u>In re Ockerlund Const. Co.</u>, 308 B.R. 325, 330 (Bankr. N.D. Ill. 2004).  Under Section 364(a), an unsecured debt incurred post-petition is allowable as an administrative expense only if incurred in the ordinary course of a debtor's business.  Otherwise, Section 364(b) requires court authorization after notice and a hearing for the debt to be treated as an administrative expense.[4]  <u>In re Husting Land & Dev., Inc.</u>, 255 B.R. 772, 777 (Bankr. D. Utah 2000), <u>aff'd</u>, 274 B.R. 906 (D. Utah 2002).

---

[4] Section 364, with regard to obtaining credit, provides:

(a) If the trustee is authorized to operate the business of the debtor . . . unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

(b) The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

While neither the Bankruptcy Code nor legislative history defines the phrase "ordinary course of business" as used in Section 364(a), the language is designed to give the debtor-in-possession or trustee operating the debtor's business the freedom to obtain unsecured credit and incur unsecured debt in the routine and normal course of business without the requirement of obtaining court approval after notice and a hearing. Husting Land & Dev., 255 B.R. at 778. In determining whether a debt has been incurred in the ordinary course of business, courts employ a two-prong test labeled a vertical test and a horizontal test. Id. at 778-79. The vertical test looks at the debtor's pre-petition business practices and conduct to determine if the transaction comports with creditor expectations (i.e. whether it involves the risks a creditor would typically expect), while the horizontal test focuses on the whether the transaction is of the sort common in the industry.

The vertical dimension focuses on the creditors' reasonable expectations, i.e. whether the transaction subjects a creditor to economic risks different from those he accepted when he decided to issue credit to the Debtor. In Armstrong World Industries, Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.), 29 B.R. 391 (S.D.N.Y. 1983), the district court set forth what has become known as the "creditor expectation" test. It explained: "[t]he touchstone of 'ordinariness' is . . . the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business. So long as the transactions conducted are consistent with these expectations, creditors have no right to notice and hearing[.]" Id. at 394. If, conversely, the transaction is one that might be considered unusual, controversial, or questionable for the debtor to undertake during its Chapter 11 case, a creditor would expect to be notified and provided an opportunity to object. Husting Land & Dev., 255 B.R. at 778–79 (citing In re Media Central,

---

11 U.S.C. § 364(a)-(b).

Inc., 115 B.R. 119, 124 (Bankr. E.D. Tenn. 1990)).  Moreover, "[e]ven if the debtor-in-possession believes its contemplated action would be beneficial to the estate, and even if it later turns out the transaction was beneficial to the estate, if [it] is not in the ordinary course of business, creditors still have the right to notice and hearing before the transaction is entered into."  Media Central, Inc., 115 B.R. at 124.  This test asks not only whether a reasonable creditor would view the transaction as deviating from the debtor's normal day-to-day operations, but also whether the transaction exposed the creditor to economic risks it did not agree to when it first extended credit.  In re Blessing Indus., Inc., 263 B.R. 268, 272 (Bankr. N.D. Iowa 2001).

In assessing creditors' reasonable expectations, courts may consider both the size and nature of the transaction.  For example, in Husting Land & Dev., 255 B.R. 772, the debtor argued that the unsecured debt it incurred was ordinary in the sense that developers like it always incur construction debt.  The court found, however, the size of the transaction—nearly one million dollars was incurred—represented a major event in the development process and the single most significant transaction for the debtor in possession.  Id. at 782.  The court concluded reasonable creditors would not expect a developer would incur close to one million dollars in debt and, therefore, the magnitude of the transaction suggested the transaction was not ordinary.  Id. at 783.

Courts also consider whether a transaction is unusual, controversial, or questionable.  For example, in Blessing Indus., 263 B.R. 268, the court found a transaction in which the debtor obtained a one-time unsecured loan in the amount of $300,000 to keep the business afloat was not a transaction in the ordinary course of business.  The court stated the loan was, "at best, an unorthodox means of doing business for the debtor" and outside the purview of the debtor's ordinary course of business under the vertical test.  Id. at 273.  Similarly, in In re Keystone Surplus Metals, Inc., 445 B.R. 483 (Bankr. E.D. Pa. 2010), the bankruptcy court found the president of the

debtor failed to establish the loans he made to the debtor were made in the ordinary course of business.  The court found while the principal may have made regular loans to the debtor before it filed bankruptcy, he made no advances to the debtor for ten months after it filed bankruptcy.  Id. at 489.  Accordingly, the "reasonable expectation" of the debtor's creditors was that such loans were not being made.  Id.

The horizontal test focuses on whether the transaction is the sort commonly undertaken by companies in that industry.  Keystone Surplus Metals, 445 B.R. at 489.  Under this test, courts compare the debtor's business with like businesses to determine whether the disputed transaction is ordinary for the particular type of business concerned.  See Husting Land & Dev., 255 B.R. at 779.  The burden is on the applicant seeking an administrative expense priority to prove similar businesses typically borrow funds in such a manner.  Keystone Surplus Metals, 445 B.R. at 489-90 (finding applicant failed to satisfy the horizontal test because he did not provide evidence to show that other similar businesses typically borrowed funds from their owners).  Some courts have rejected the horizontal test as being in line with the ordinary course of business defense to preference liability under Section 547 but inconsistent with Section 364.  These courts point out the horizontal test is redundant to the creditor expectation test and difficult to apply.  See Husting Land & Dev., 255 B.R. at 799 and cases discussed therein; see also Blessing Indus., 263 B.R. 268 (where the horizontal test is described but not applied)

Norcross Hospitality's Motion asserts the loan and resulting claim were an ordinary course of business transaction, but counsel did not press the point at the hearing.  The Court finds it was not an ordinary course of business transaction.

Under the vertical test, the size and nature of the transaction suggest the transaction was not in the ordinary course of Debtor's business.  The magnitude of the transaction—which

involved incurring over $5 million—represented a major event in the Debtor's operations and bankruptcy case.  The acquisition of the Property, when the Debtor held virtually no property, is a significant transaction.  Moreover, the transaction was unusual and clearly outside the purview of the Debtor's ordinary course of business.  While the Debtor and related companies had engaged in inter-company borrowing pre-petition, the Debtor had no intercompany secured debt when it filed bankruptcy and no money had been borrowed from any of the related Debtors or other affiliates during the three years the bankruptcy cases had been pending before the Debtor executed the Note in August 2018.  The Court notes that the affiliated debtor, Sugarloaf, had borrowed money post-petition from a third party and authority had been sought and obtained for that borrowing (Case No. 15-58440 Doc. No. 454 ), so the ordinary procedure for the Debtors was to obtain court approval.  Just as in <u>Keystone Surplus Metals</u>, the Court concludes the "reasonable expectation" of the Debtor's creditors in 2018 was that such loans were not being incurred.  The Court concludes that, under the vertical inquiry, the Debtor's creditors would not have expected the Debtor to be engaged in a transaction of this size and nature, both of which were not within the day-to-day operations of the business and were therefore extraordinary.

As to the horizontal inquiry, the Court agrees with the <u>Husting Land & Dev.</u> case and others that conclude the horizontal test does not add much to the analysis.  But even considering the horizontal test, Norcross Hospitality offered no evidence of similar situations where businesses "ordinarily" obtain multi-million-dollar loans from insiders to exercise repurchase options at the ninth hour.  All the facts demonstrate the transaction was highly unusual and weigh against finding the financing was obtained in the ordinary course of the Debtor's business.  Accordingly, Norcross Hospitality has failed to demonstrate it is entitled to an administrative expense claim on the basis its claim was incurred by the Debtor in the ordinary course of business.

B.       *Nunc pro tunc* **Approval is Not Warranted**

Norcross Hospitality contends the Court should exercise its equitable power to approve its loan *nunc pro tunc*; the Chapter 11 Trustee argues the circumstances do not warrant such extraordinary relief.

Generally, a debtor may only borrow money outside the ordinary course of business if authorized by the court. The Supreme Court recently ruled that *nunc pro tunc* orders, or "now for then orders," are only appropriate to reflect events that actually happened. Roman Catholic Archdioceses of San Juan, Puerto Rico v. Acevedo Feliciano, 140 S.Ct. 696, 701 (2020) ("Such a decree presupposes a decree allowed, or ordered, but not entered, through inadvertence of the court."). As the Court counseled in Acevedo, *nunc pro tunc* orders should *not* be used to revise history and to create "facts" that never happened. See id.

Further, while the bankruptcy court has statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, 11 U.S.C. § 105(a), that authority is not unfettered. "It is hornbook law that §105(a) 'does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code.'" Law v. Siegel, 571 U.S. 415, 421 (2014). "Section 105(a) confers authority to 'carry out' the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits." Id. These cases cast serious doubt on the Court's ability to grant *nunc pro tunc* approval for a transaction that was not initially authorized, and the cases on which Norcross Hospitality relies pre-date Acevedo and Law.

To the extent the Court retains discretion to retroactively approve such financing, older cases permit *nunc pro tunc* relief only in exceptional circumstances. Such relief is within the equitable power of a bankruptcy court and is discretionary, In re Alafia Land Dev. Corp., 40 B.R.

16

1 (Bankr. M.D. Fla. 1984), and "an unauthorized loan may receive priority as an expense of administration in unusual circumstances." In re Am. Cooler Co., 125 F.2d 496, 497 (2d Cir. 1942). Thus, under this line of cases, an unauthorized loan may receive priority as an expense of administration in rare circumstances. Alafia, 40 B.R. at 4. As other courts have recognized, though, "only a foolhardy lender will attempt to make it serve as a substitute for proper authorization." Am. Cooler Co., 125 F.2d at 497.

Cases have granted *nunc pro tunc* approval of previously unauthorized post-petition loans only where the court 1) is confident that it would have authorized the transaction if a timely application had been made; 2) is reasonably persuaded that the creditors have not been harmed; 3) takes into account, as bearing on the good faith of the debtor and lender, whether they honestly believed they had authority to enter the transaction without court approval. See Am. Cooler Co., 125 F.2d at 497. The Court concludes that even under the case law that would permit *nunc pro tunc* approval, no exceptional circumstances exist here to warrant such relief. Even if no creditors were actually harmed by the unauthorized financing as it turned out, Norcross Hospitality failed to demonstrate extraordinary facts existed to prevent it from following the explicit mandates of the Code.

That a transaction has a tight timeframe does not excuse a party from seeking court approval for financing; that a debtor needs funds on an expedited basis does not authorize it to act first and seek approval retroactively later. For example, in Blessing Indus., Inc., 263 B.R. 268, the investor argued that the debtor's need for funds was immediate and it did not have time to seek court approval. The court found the argument was not persuasive because ten days had passed from the initial discussions of the possible cash infusion until the funds were actually expended. Further, the court noted that the Code provides for an expedited hearing in cases of emergency,

and often a hearing as early as the next day. Id. at 274 (citing Fed. R. Bankr. P. 4001(c)). The creditor knew it had to receive court approval before proceeding with the transaction but failed to do so, and *nunc pro tunc* approval was not appropriate merely because time was of the essence. Id.; see also In re C.E.N., Inc., 86 B.R. 303, 307 (Bankr. D. Me. 1988) (noting section 364(b) contains provisions that provide an express procedure to obtain authorization for borrowing and it was hard to explain why debtor and insider did not apply to court initially for proper court authorization).

If a timely application had been filed, the Court would *not* have approved the loan as structured because of the term, the interest rate, the amount borrowed and the identity of the lender. The Note was a short-term note with a maturity date a mere 120 days after the Note was executed. The bankruptcy case had already been pending for three years, and yet the Debtor had not proposed a viable solution for addressing the Property; it is entirely unclear how the Debtor planned to resolve the matter in four months. The Debtor had fought hard during the case to not sell the Property, and Mr. Thakkar had personally contributed to the Westplan purchase price to retain the option for the Debtor to reacquire and develop the Property. The exercise of the option was for the purpose of developing the Property, but yet the Debtor had no funds with which to proceed. The structure of the loan suggested to the Court a mechanism that allowed Mr. Thakkar to remove the Property from the Bankruptcy Court's supervision because the Debtor would likely default at the end of the four-month term and Rass and Norcross Hospitality would seek to foreclose. The Court's concern was validated in part by the Debtor's response to the Show Cause Order proposing that the Property simply be transferred to Norcross Hospitality.

The Note also included a high interest rate of 12 percent, double the rate Norcross Hospitality received from Metro City Bank to obtain the loans it in turn offered to the Debtor. The

transaction resulted in fully encumbering the Property with liens and saddled the Debtor with substantial debt that far exceeded what the Court had determined to be a fair market value for the Property a year earlier: the Court had approved the sale of the Property in May 2017 for $7.3 million; on August 20, 2018, the Debtor repurchased the Property for over $9.2 million. Even setting aside the fact Norcross Hospitality is an insider of the Debtor, these terms would have given the Court serious cause for concern. The Court expressed its concerns about the terms of the transaction throughout the fall of 2018 when it realized what had happened. But these egregious terms offered by an insider, coupled with the circumstances of the cases, convinces the Court it would not have approved the loan. For all these reasons, the first factor weighs against granting *nunc pro tunc* relief.

The second factor is whether the Court is reasonably persuaded the creditors have not been harmed. As it turned out, because the Court appointed a trustee and the Chapter 11 Trustee successfully auctioned the Property, the creditors will receive a distribution in excess of what was anticipated in August 2018. But the fact the creditors may fare well in the end was not at all apparent when the parties entered into the transaction in August 2018. The transaction was risky, and it was not at all apparent that the Debtor would be able to sell the Property for more than the total debt owed to Rass and Norcross Hospitality; rather, a foreclosure seemed imminent. The Debtor's response to the Court's Show Cause Order demonstrates that the Debtor did not intend the creditors to receive any distribution. The Debtor opined there was no equity in the Property, and it could only be developed by transferring it to Norcross Hospitality. Further, the Chapter 11 Trustee was integral to the sales process that ultimately resulted in generating proceeds for the benefit of creditors. This factor does not weigh strongly in favor of granting extraordinary relief.

Third, the Court does not find the Debtor and Norcross Hospitality could have honestly believed they had authority to enter into the transaction without Court approval.  Mr. Thakkar was the manager of both the Debtor and Norcross Hospitality.  By the time of the transaction, he had been involved in the Debtors' bankruptcy cases and before the Court many times over the course of three plus years.  Mr. Thakkar failed to seek approval from the Court, despite knowing financing required Court approval and that the Court could grant—and had granted on several occasions during the pendency of the case—expedited hearings and considered matters on an emergency basis.  Sugarloaf had sought and obtained approval of post-petition financing on October 28, 2016 (Case No. 15-58440 Doc. No. 454) and the Court had entered an Order on April 28, 2017 authorizing additional post-petition financing for all Debtors which was not consummated.  (Case No. 15-58440 Doc. No. 780).  Mr. Thakkar knew he needed to receive court approval before proceeding with the transaction, but he failed to even alert his counsel about seeking funding and repurchasing the Property, let alone seek Court authorization of the same.  The Debtor also had significant lead time to seek court approval of any loan.  It received notice of the deadline to exercise the repurchase option on May 22, 2018, which would expire on August 20, 2018.  It did not do anything for three months.  Even if all the details were not worked out until the last minute, the Debtor could have filed a motion well in advance of the deadline which could have been heard before the loan was made.  Once the transaction closed, Mr. Thakkar remained silent.  It was not until the Court issued its Order to Show Cause that Debtor's counsel learned about the transaction, and it was another two weeks before the Debtor filed a motion to retroactively approve the financing.  The third factor weighs heavily against granting *nunc pro tunc* approval here.

The Court also finds the Supreme Court's <u>Acevedo</u> and <u>Law</u> decisions counsel against granting extraordinary *nunc pro tunc* relief in this case.  Granting *nunc pro tunc* relief here, to

authorize a loan transaction the Court never would have authorized at the time it was entered into, would not reflect the reality of what happened at the time and would essentially create facts by blessing an unorthodox transaction that would have never been sanctioned.  Further, section 105(a) cannot be used to carry out actions the Code prohibits.  Because section 364 provides an express procedure to obtain authorization for borrowing, section 105(a) should not be used to override these specific protocols.  The Court finds Norcross Hospitality has failed to carry its burden to prove a *nunc pro tunc* order is justified in this case and, accordingly, the Court will not exercise any equitable powers, even if it has them in this situation, to approve the Norcross Hospitality financing *nunc pro tunc*.

**C.**      **Norcross Hospitality Lacks Standing to Assert a Substantial Contribution Claim**

Norcross Hospitality alternatively argues it should be awarded an administrative expense claim pursuant to Section 503(b)(3)(D) and (b)(4) for making a substantial contribution.  It contends its actions conferred a significant benefit to the estate and its motive should not detract from, or even factor into the analysis of whether, it made a substantial contribution.  The Chapter 11 Trustee argues Norcross Hospitality does not have standing to seek a substantial contribution claim and is not entitled to such a claim.

Section 503(a) allows an entity to file an administrative expense claim for certain fees and expenses.  11 U.S.C. § 503(a) ("An entity may timely file a request for payment of an administrative expense").  Norcross Hospitality, as the applicant, carries the "'heavy burden of demonstrating that the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets.'" In re Energy Future Holdings Corp., 588 B.R. 371, 384 (Bankr. D. Del. 2018), aff'd, 2019 WL 4751568 (D. Del. Sept. 30, 2019); see also In re S & Y Enters., 480 B.R. 452 (Bankr. E.D.N.Y.

2012) (explaining the standard for recovering on an application for a substantial contribution administrative expense is high because these expenses are paid on a priority basis and reduce the funds available for distribution under the debtor's plan of reorganization).

Section 503(b), which provides for the allowance of an administrative expense claim after a notice and hearing, uses the word "including" and then proceeds to list nine specific instances where an administrative expense claim is allowed. One of those specific instances is set out in Section 503(b)(3)(D) which provides:

> (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by-
>
> > (D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a [court-appointed] committee . . . , in making a substantial contribution in a case under chapter 9 or 11 of this title[.]

11 U.S.C. § 503(b)(3)(D). Subsection (b)(4) then provides that reasonable attorney's fees are allowable as an administrative expense if a creditor is entitled to recover its expenses under subsection (b)(3). 11 U.S.C. § 503(b)(4).

Section 503(b)(3)(D) clearly provides only certain entities—a creditor, an indenture trustee, an equity security holder, and an unofficial committee—can assert a claim for substantial contribution. Norcross Hospitality is none of these. It is not a creditor pursuant to Section 101(1).[5] It did not have a claim as of the petition date, was not included on the Debtor's schedules, and never filed a proof of claim. The Debtor has never asserted that Norcross Hospitality was a

---

[5] Pursuant to 11 U.S.C. § 101(10), a "creditor" is defined as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor . . . [an] entity that has a claim against the estate of a kind specified in sections 348(d), 502(f), 502(g), 502(h) or 502(i) of this title; or . . . [an] entity that has a community claim." 11 U.S.C. § 101(5)(a), in turn, defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

creditor.  Further, the Court has determined *nunc pro tunc* approval of its post-petition loan is not appropriate.

Likewise, Norcross Hospitality is not an equity security holder, even if it shares common membership with the Debtor.  It is undisputed the members of this Debtor are Niloy and Rohan Thakkar.  The majority members of Norcross Hospitality are the same.  While the Debtor and Norcross Hospitality are affiliates, the Debtor and all the related Debtors have maintained that they are separate entities and their cases should not be substantively consolidated.  The Court has repeatedly denied requests to substantively consolidate the cases and has recognized that, although all five Debtors are owned directly or indirectly by members of the Thakkar family, each Debtor is a separate corporation, the Debtors do not all have the same ownership, and each Debtor owned different property that served different purposes.  (See Case No 15-58440 Doc. No. 797).  The Debtors and Norcross Hospitality have held themselves out to creditors as being separate.  For example, Norcross Hospitality borrowed money from Metro Bank and others according to the evidence which it used at least in part to loan to the Debtor.  Having maintained the entities are separate and providing no evidence that the corporate structure of the Debtor and Norcross Hospitality should be ignored, the Court cannot now presume them to be the same.  See Energy Future Holdings Corp., 588 B.R. at 386 (denying claim by claimant who alleged it was a creditor through one of its subsidiaries but made no showing that it itself was a creditor of the debtors' estates).  Accordingly, Norcross Hospitality is not an equity security holder.  It is also not an indentured trustee or unofficial committee.  Simply put, Norcross Hospitality does not fall under any of the categories permitted to assert an administrative claim under Section 503(b)(3)(D).

The Court recognizes that Section 503(b) is not intended as an exclusive list of administrative expense claims.  See In re Engler, 500 B.R. 163, 174 (Bankr. M.D. Fla. 2013); see

also Mediofactoring v. McDermott (In re Connolly N. Am., LLC), 802 F.3d 810, 816 (6th Cir. 2015) (stating there is a "broad consensus that the categories listed in the statute are not exhaustive").  Section 503(b) provides that, "[a]fter notice and a hearing, there shall be allowed administrative expense claims, *including* for the specifically enumerated categories."   Id. (emphasis added).  Section 102 specifically recognizes that the word "including" is not intended to be limiting.  11 U.S.C. § 102(3).  "So there is no question that the list of categories of administrative expense claims in Section 503(b) is not exhaustive." Engler, 500 B.R. at 174 n.69; see also In re Elder, 321 B.R. 820, 828–29 (Bankr. E.D. Va. 2005) (explaining the categories of administrative expenses listed in Section 503(b) "are merely illustrative of the types of administrative expenses that may be awarded under § 503(b) which permits administrative expenses and, before enumerating [nine] types, says, 'including' thus making the following [nine] subsections illustrations of administrative expenses and not a limitation on the administrative expenses that may be awarded.").

The Court acknowledges there is a split of authority about whether an entity not specifically listed in Section 503(b)(3) has standing to assert a substantial contribution claim.  Some courts have read Section 503(b) expansively and have considered substantial contribution claims by parties not listed in the statute.  See e.g., S & Y Enters., 480 B.R. 452; Connolly N. Am., LLC, 802 F.3d at 816.  Others have interpreted Section 503(b)(3)(D) narrowly to permit only the enumerated entities to seek substantial contribution administrative expense claims.  See, e.g., Engler, 500 B.R. at 174 (while recognizing the list of administrative expenses is not limiting, the specifics of subsection 503(b)(3) overcome the general); In re First Baldwin Bancshares, Inc., 2013 WL 2383660 (Bankr. S.D. Ala. May 30, 2013).

Courts adopting the broad view have concluded Section 503(b)'s "enumeration of categories of prospective applicants for a substantial contribution administrative expense is illustrative, not exclusive". See S & Y Enters., 480 B.R. at 461. The court in S & Y Enters stated: "it is simply not possible to craft a comprehensive list, or even a particularized legal standard, sufficient to encompass the wide range of entities and enterprises that may merit an administrative expense based on a substantial contribution in a Chapter 11 case." Id. at 462; see also In re Frog & Peach, Ltd., 38 B.R. 307, 310 (Bankr. N.D. Ga. 1984) (finding the applicant, an unsuccessful bidder, failed to meet the statutory requirement for standing but suggesting non-creditor claimants with meritorious contributions might have allowable administrative claims).

Courts adopting the narrow view have held only entities specifically listed in section 503(b)(3)(D) may pursue substantial contribution claims. For example, in In re Mountain Creek Resort, Inc., 616 B.R. 45, 2020 WL 1189563 (Bankr. D.N.J. Mar. 11, 2020), the county asserted an administrative expense claim for approximately $200,000 it incurred in objecting to a settlement in the case, arguing its efforts in changing the deal benefited creditors and the estate. The debtors objected and sought to disallow the claim on the basis the county lacked standing to assert an administrative claim under Section 503(b)(3)(D). The county argued it was an "indirect creditor" or "party-in-interest," and the court should consider the enumerated categories in Section 503(b)(3)(D) as illustrative and focus on the results it achieved in the case. The court declined to do so and sustained the debtor's objection. The court explained standing is a prerequisite to recovery under Section 503(b)(3)(D), so if the county lacked standing it was "of no consequence as to whether it made any contribution—substantial or otherwise—to the estate." Id. at *3.

The court looked to both the text of the statute and the legislative history of Section 503(b)(3)(D) and determined the statute was not an ambiguous and nonexclusive statute. The

court found the statute clearly provides only certain entities can seek expenses incurred in making a substantial contribution.  The court noted Congress could have stated other entities beyond those listed in the statute could pursue substantial contribution administrative expense claims, but it did not.  Id. at *6-7 (explaining if Congress intended to expand the list of entities beyond those listed in Section 503(b)(3)(D), it would have done so, as it did when it amended the section to include a creditors committee as a party authorized to receive reimbursement; Congress could have also easily inserted the word "including" in the section; and if Congress intended to extend standing to a party in interest, it would have used that term).  The court noted the strict approach balanced the important bankruptcy policies of encouraging valuable creditor participation and keeping administrative expenses low to preserve the estate.  The court stated it "respectfully disagree[d] that the categories of claimants eligible to recover under § 503(b)(3)(D) should be expanded because such an expansion sets the bar for standing too low and spreads the benefits too wide[.]" Id. at *7.  The court held the list of enumerated parties under Section 503(b)(3)(D) is exhaustive and unambiguous, and the county, "a so-called 'good Samaritan,'" was not among the entities expressly delineated in Section 503(b)(3)(D).  Id.  Accordingly, it was not entitled to an administrative expense under the statute.  See also First Baldwin Bancshares, Inc., 2013 WL 2383660 at *2 (finding a potential purchaser, which was not in fact a creditor, was not entitled to take administrative priority over unsecured creditors under Section 503(b)(3)(D)).

This Court joins the courts that have recognized "[w]hen a subsection directly addresses the type of administrative expense sought, the restrictions in it cannot be avoided by appealing to the non-exclusive nature of § 503(b)." Engler, 500 B.R. at 174; see also Surrey Inv. Servs., Inc. v. Smith, 418 B.R. 140, 148 (M.D.N.C. 2009) ("However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same

enactment."); Elder, 321 B.R. at 829 ("when a subsection directly addresses the type of administrative expense sought, the restrictions in it cannot be avoided by appealing to the non-exclusive nature of § 503(b)."); In re Beale, 358 B.R. 744, 748 (Bankr. N.D. Ill. 2006) (citing Elder).  Since Section 503(b)(3)(D) specifically identifies the parties with standing to assert a substantial contribution claim in a chapter 11 case, the Court declines to broaden that reading. Whereas other, non-substantial contribution, administrative claims may possibly be filed by non-creditors under Section 503(a) or (b) generally, the statute is very specific about the type of entity that may file substantial contribution claims in a chapter 11 case under Section 503(b)(3)(D) and (b)(4).  The Court concludes Norcross Hospitality lacks standing to assert an administrative expense claim based on a substantial contribution.

### D.    The Circumstances Are Not Extraordinary to Otherwise Warrant Allowance of an Administrative Expense

Notwithstanding its inability to qualify for an administrative expense claim pursuant to Sections 364, 503(b)(3)(D), and 503(b)(4), Norcross Hospitality contends the Court is not precluded from treating its post-petition loan to the Debtor as an administrative expense claim on other, equitable grounds.  It relies on In re Reilly, 542 B.R. 317 (Bankr. W.D.N.Y. 2015), in arguing it should be awarded an administrative expense claim because, it claims, the Debtor had a legitimate need for the funds, the loan did not impair creditor interests and in fact the Property acquired in part with the loan ultimately provided a substantial distribution to the creditors.  The Chapter 11 Trustee contends there are no unusual circumstances to warrant priority as an administrative expense here.

The cases cited by Norcross Hospitality articulate the standard for *nunc pro tunc* approval considered above.  As discussed above, such discretion should be exercised with caution.  See Frog & Peach, Ltd., 38 B.R. at 310 (explaining court was "extremely reluctant to open a potential

floodgate of claims by outsiders which transact with a debtor in bankruptcy, but whose claims are not specifically authorized under § 503(b).").

The Court is also mindful "[w]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." In re Garofalo's Finer Foods, Inc., 186 B.R. 414, 432 (N.D. Ill. 1995) (citing Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988)).  Absent specific statutory authority, a bankruptcy court may not apply its general equitable powers to disregard or contravene the Code's unambiguous provisions.  Id. The Bankruptcy Court's equitable powers under Section 105(a) do not override specific Bankruptcy Code provisions; they supplement those provisions and fill in gaps and ambiguities. Ockerlund Const. Co., 308 B.R. at 330 (citing Levit v. Ingersoll Rand Fin. Corp., 874 F.2d 1186, 1197–98 & n.10 (7th Cir.1989) ("'There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted.'")); see also Law, 571 U.S. at 421.

While Section 503(b)(3) is not intended as an exclusive list of administrative expense claims, the Court believes it would only be appropriate to grant such a claim if a circumstance was truly unanticipated, not merely as a work around when a claimant fails to satisfy the requirements of Sections 364, 503(b)(3)(D), and 503(b)(4).  When a subsection directly addresses the type of administrative expense sought, as these sections do, the restrictions in it cannot be avoided by appealing to the non-exclusive nature of Section 503(b) and, in any event, the facts of this case do not justify the exercise of discretion to allow Norcross Hospitality an administrative expense claim.

### E.    Administrative expense conclusion

The loan from Norcross Hospitality was not incurred by the Debtor in the ordinary course of business.  Pursuant to Section 364, a debtor in possession must receive court approval to obtain

28

unsecured credit outside the ordinary course of business.  Approval must be obtained *before* incurring the debt.  If a debtor has not obtained court approval before incurring debt, and if the bankruptcy court has authority to retroactively approve the transaction, such approval is limited to situations in which exceptional circumstances exist.  Neither Norcross Hospitality nor Debtor provided an adequate explanation for their failure to seek prior authorization or demonstrated that the circumstances of the case present one of those rare situations in which retroactive authorization is appropriate.  Norcross Hospitality does not have standing to seek an administrative claim under Sections 503(b)(3)(D) and (b)(4).  To allow Norcross Hospitality an administrative expense claim, when it was required but failed to obtain prior approval after notice, would render Section 364 meaningless.  See Ockerlund Const. Co., 308 B.R. at 330 (explaining Section 364 "would be incapacitated").  The Court does not find the circumstances warrant overriding the specific provisions of these sections to craft a new administrative expense under Section 503(b).  Despite Norcross Hospitality arguing no creditors were actually harmed by the unauthorized financing, it has failed to demonstrate extraordinary circumstances existed that prevented it from following the explicit mandates of the Bankruptcy Code.  Accordingly, the Court denies Norcross Hospitality's application for administrative expense priority claim.

### IV. Resulting claim of Norcross Hospitality

Having determined that Norcross Hospitality does not have a priority administrative expense claim, the question becomes whether Norcross Hospitality should nevertheless be allowed a "claim" and, if so, what priority it should hold.

Courts have come to different conclusions about whether a post-petition loan that does not qualify as an administrative priority claim is still eligible for treatment as a general unsecured claim or whether it should be excluded from distribution.  Ockerlund Const. Co., 308 B.R. at 330.

On the one hand, some courts have found that the lender of an authorized post-petition loan may have a general unsecured claim.  See John Deskins Pic Pac, Inc. v. Flat Top National Bank (In re Johns Deskins Pic Pac, Inc.), 59 B.R. 809, 812 (Bankr. W.D. Va. 1986) ("Where borrowing is out of the ordinary course of business and prior court authorization is not obtained, the lender, as in this case, faces relegation to the status of a general unsecured creditor.").  In Husting Land & Dev., 255 B.R. 722, the court noted in passing if a debt is not incurred in the ordinary course of business, or the court does not approve the post-petition debt, then the creditor to whom the unsecured debt is owed must stand in line with all other pre-petition unsecured creditors.  Id. at 778.

Many of the decisions that have awarded post-petition lenders general-unsecured-claim status have not discussed their reasoning in detail.  See Ockerlund, 308 B.R. at 331.  For example, in In re Cascade Oil Co., Inc., 51 B.R. 877 (Bankr. D. Kan. 1985), the court found the bank's claim was not entitled to priority, administrative or otherwise and then considered whether the debt should be on a parity with allowed unsecured claims.  The court noted that the Code recognizes claims may be equitably subordinated pursuant to Section 510(c), but subordination was neither sought nor warranted under the circumstances.  Without explaining its rationale, the court concluded the bank's claim would be "allowed on a parity with other allowed unsecured claims." Id. at 883 (the court did not allow interest, stating without any discussion that interest was precluded by "equitable considerations combined with the determination [the bank] was not a section 364(a) lender.").

On the other hand, several courts have held that an authorized post-petition lender is not even entitled to a general unsecured claim.  For example, in Alafia Land Dev Corp, 40 B.R. 1, after the court denied nunc pro tunc approval of unauthorized post-petition financing, the lender argued that it should be entitled to be recognized as a creditor and at least awarded the status of a

general unsecured creditor.  Id. at 5.  The court stated: "one who lends money to a debtor in possession without prior approval of the Court is not even entitled to the status of a general unsecured claim."  Id.  It explained that to hold otherwise, to ratify unauthorized borrowings or out of the ordinary course of business transactions except under exceptional circumstances, would create a dangerous precedent.  Id.

Further, the definition of a "creditor" usually requires a right to payment from, or a claim against the debtor, before a bankruptcy case is filed.  Ockerlund Const. Co., 308 B.R. at 331.  In Diversified Traffic Svcs., Inc., 2012 WL 1191984 (Bankr. S.D. Ga. Mar. 29, 2012), the court found the lender of an authorized post-petition loan was not a creditor because it did not have an allowed claim.  The court noted the alleged claimant did not have a right to payment before the debtor filed bankruptcy.  Id. at *3.  Accordingly, the lender was not a creditor and it could not be bound by a debtor's chapter 11 plan.  Id.  (The court noted the lender was free to pursue its state court remedies.)  The Ockerlund court firmly stated it had "no apparent authority in light of the language and structure of the Bankruptcy Code to create some type of post-petition general unsecured claim for loans that fail to qualify for priority under §503(b) and §507(a)(1)."  308 B.R. at 332.

Even courts that have held lenders of unauthorized post-petition loans are generally not entitled to general unsecured claims may recognize and authorize payment to such lenders in unusual circumstances.  For example, in Alafia, the court found because the circumstances of the case were unusual—the case was solvent and the debtor planned to pay all allowed claims in full pursuant to a confirmed plan—it considered recognizing the applicant's claim under equitable principles.  The court found it would be patently unfair to permit the debtor to reap a windfall by retaining the surplus generated from its enhanced equity position in the subject property as a result of the infusion of funds.  Id. at 6.  While the claim was disallowed as a priority and general

unsecured claim, the court used its equitable authority to allow the lender a claim after all unsecured claims had been paid and before equity received a distribution. (Even though funds were available for distribution, the court limited the claim to the amount of benefit to the estate – the lender would be paid to the extent the principal and interest obligations on existing mortgages were reduced by the funds advanced by the applicant). In Ockerlund, the court noted that while its conclusion seemed harsh, it would not be so severe in administratively insolvent cases in which general unsecured creditors would not receive a dividend anyway. Id. at 332. Perhaps it would have considered an equitable solution like the one crafted in Alafia had the case been solvent.

The Court agrees with the Ockerlund court that Norcross Hospitality, as an unauthorized post-petition lender, is not automatically entitled to a general unsecured claim. Given the unusual circumstances of this case, however, the Court concludes it will use its equitable authority to allow Norcross Hospitality a "claim" in this case. The case is solvent and the Debtor plans to pay all allowed claims in full. Moreover, the case is solvent because Norcross Hospitality provided funds to the Debtor to repurchase the Property, which the Chapter 11 Trustee ultimately sold to generate sales proceeds. The Court therefore finds Norcross Hospitality should share in the distribution of funds in the bankruptcy case in some manner.

Having determined that Norcross Hospitality should receive a distribution in this case, the Court must determine whether Norcross Hospitality should share with the general unsecured creditors, share with Nilhan Financial, or receive funds after all other claims in the case have been paid. The Chapter 11 Trustee contends Norcross Hospitality should be last in line to receive payment. Norcross Hospitality argues it would be unfair for Norcross Hospitality to be paid last when there would not be any funds available to distribute to any of the other creditors if it had not extended funds to the Debtor to exercise the repurchase option. Norcross Hospitality argues, at a

minimum, its claim should be paid *pari passu* with the claim of Nilhan Financial, which it contends is also an insider of the Debtor.

Norcross Hospitality engaged in inequitable conduct. The transaction was a highly questionable one that resulted in fully encumbering the Property with no authority to do so and with no knowledge of the Court. When the Court issued an Order to Show Cause and directed the Debtor and its counsel to appear and explain to the Court the circumstances of the alleged repurchase, the Debtor proposed that the Property simply be transferred to Norcross Hospitality. The Court declined to do so. The Court could not look the other way given the magnitude of the transaction. It was not simply that the Debtor borrowed $9 million, which exceeded the previous amount of debt secured by the Property, but that $5 million of that came from insiders and all of that was done without telling counsel and the Court. The Court previously found this conduct constituted cause for the Court to appoint a Chapter 11 Trustee.

Norcross Hospitality contends there is no evidence that the financing resulted in injury to creditors—it points out that the estate has $8 million available for distribution. On the one hand, the general unsecured creditors in this case will benefit from the sale of the Property, which the Debtor repurchased using the funds from Norcross Hospitality's loan. If Norcross Hospitality is allowed to share equally with the general unsecured claims, the other general unsecured creditors will receive a smaller distribution than they would if Norcross Hospitality did not participate in the distribution, but they would not receive any recovery at all if Norcross Hospitality had not made the loan. On the other hand, the existence of funds to distribute was not caused solely by Norcross Hospitality's loan but resulted in spite of the Debtor's and Norcross Hospitality's maneuvers. While Norcross Hospitality loaned the Debtor funds to repurchase the Property, the Debtor and Norcross Hospitality contended the Property held no value for creditors and that it

33

should simply be transferred to Norcross Hospitality.  If the Court had not appointed a trustee, no funds for distribution would exist.  It was the Chapter 11 Trustee who succeeded in generating a return for creditors by selling the Property through a competitive bidding process that resulted in a high sales price.  Norcross Hospitality now contends it was a foregone conclusion that the Debtor's creditors would benefit from the loan transaction, but that was not the position of the Debtor at the time.  In the fall of 2018, it was unlikely that the Debtor's creditors would collect on their debts.

Norcross Hospitality urges the Court to only subordinate its claim to third party creditors, and that, at a minimum, it should be paid in line with Nilhan Financial, which it contends is a "fellow insider."  The members of Nilhan Financial, Niloy and Rohan Thakkar, are also the members of the Debtor.  (See Case No. 15-58440 Doc. No. 1295 Ex. 2 p. 6.)  Because corporations, including limited liability corporations, with common ownership are affiliates and therefore insiders, and because the Debtor and Nilhan Financial have common owners, Nilhan Financial falls within the definition of an insider.  Nilhan Financial, however, is currently a Chapter 7 debtor and its estate is represented by a Chapter 7 Trustee.

As a general rule, an entity which acquires a claim steps into the shoes of that claimant, enjoying both the benefits and the limitations of the claim, as a successor in interest.  Carnegia v. Georgia Higher Education Assistance Corp., 691 F.2d 482, 483 (11th Cir. 1982).  However, a third-party assignee does *not* become an insider as a matter of law by acquiring the claim.  Instead, "a person's insider status is a question of fact that must be determined after the claim transfer occurs."  In re Village at Lakeridge, LLC, 814 F.3d 993, 1000 (9th Cir. 2016).  As the court in Village at Lakeridge explained, "insider status is not a property of a claim, general assignment law—in which an assignee takes a claim subject to any benefits and defects of the claim—does

34

not apply." Id.  Although that case concerned another aspect of bankruptcy law, the same principles apply here.  While Nilhan Financial is an insider of the Debtor, the Chapter 7 Trustee of the Nilhan Financial estate is not necessarily an insider of the Debtor.

Even if Menchise, as the Trustee for Nilhan Financial is an insider, there is no rule that all insider claims must be treated the same.  The claims of Nilhan Financial and Norcross Hospitality are not entitled to equal treatment here.  Nilhan Financial's claim is an allowed prepetition general unsecured claim.  (Case No. 15-58440 Doc No. 1365.)  The request for payment of Norcross Hospitality is not a prepetition claim, not an allowed claim as that term is used in the Bankruptcy Code, and Norcross Hospitality is not a creditor as defined in Section 101(10).  As the Ockerland court explained, the court could not approve a plan that required general unsecured creditors to share their distribution with non-creditors like Norcross Hospitality.  On that basis alone, separate and different treatment of the Nilhan Financial and Norcross Hospitality claims is justified.  Ockerlund Constr. Co., 308 B.R. at 332.

Additionally, Nilhan Financial's claim arose through actions taken in good faith.  Norcross Hospitality's request for payment, on the other hand, arises from a failure to comply with the Bankruptcy Code and an effort to avoid payment of creditors by requesting the court to simply permit the transfer of what the Debtor alleged was fully encumbered property to Norcross Hospitality thus removing any possibility of recovery for the creditors.  Such actions, and the difference in the genesis of the claims, would justify subordination of equal claims under 11 U.S.C. § 510(c), as requested by the Chapter 11 Trustee.

Pursuant to Section 510(c), the Court may subordinate or postpone payment of a claim when a creditor engages in misconduct that harms other creditors.  11 U.S.C. 510(c).  Equitable subordination is appropriate when: 1) claimant engaged in inequitable conduct; (2) the conduct

35

has injured creditors or given unfair advantage to the claimant; and 3) subordination of the claim

is not inconsistent with the Bankruptcy Code.  In re Citrus Tower Blvd. Imaging Ctr., LLC, 520

B.R. 892, 904 (Bankr. N.D. Ga. 2014) (citing Benjamin v. Diamond (In re Mobile Steel), 563 F.2d

692, 699-700 (5th Cir. 1977)).  These factors are not exclusive, and the three-prong test should be

applied flexibly.  In re Friedman's, Inc., 356 B.R. 766 (Bankr. S.D. Ga. 2006).  Bankruptcy courts

should consider whether subordinating a particular claim would be fair based on the totality of the

circumstances of the individual case.  In re Merrimac Paper Co., Inc., 420 F.3d 53 (1st Cir. 2005)

(citing U.S. v. Noland, 517 U.S. 535 (1996)).

Courts closely scrutinize the conduct of the claimant when the claimant bears a close

relationship to the debtor.  While "insider status alone is insufficient to warrant subordination," In

re Magnolia Gas Co., L.L.C., 255 B.R. 900, 924 (Bankr. W.D. Okla. 2000), the dealings between

a debtor and an insider are to be rigorously scrutinized.  In re Fabricators, Inc., 926 F.2d 1458,

1465 (5th Cir. 1991).  Where the claimant is an insider, the standard of misconduct is lower and

the trustee must merely demonstrate the conduct was "unfair," rather than "egregious conduct such

as fraud, spoliation, or overreaching" required for non-insiders.  Durango Ga. Converting, LLC v.

Pension Benefit Guar. Corp. (In re Durango Ga. Paper Co.), 539 B.R. 896, 903 (Bankr. S.D. Ga.

2015).  Once the trustee meets his burden, the claimant then must prove the fairness of the

transaction with the debtor.  N&D Props., Inc., 799 F.2d 726, 731 (11th Cir. 1986).  The burden is

on the insider to show not only good faith but also the inherent fairness of the transaction.  See

Pepper v. Litton, 308 U.S. 295, 306 (1939).

Because Norcross Hospitality is an insider, the standard for equitable subordination is a

lower one, and all the factors weigh in favor of equitable subordination here.  As explained above,

Norcross Hospitality engaged in inequitable conduct and the transaction was a dubious one that

resulted in fully encumbering the Property with no authority to do so and with no knowledge of the Court. Further, while the conduct may not have injured creditors in the end, that it is thanks in a large part to the efforts of the Chapter 11 Trustee. The transaction also gave Norcross Hospitality an unfair advantage that it would not have otherwise had in this case. Finally, subordination of the claim is not inconsistent with the Bankruptcy Code. Norcross Hospitality's claim is not entitled to status as a general unsecured creditor as a matter of right, and the Court is using its equitable powers to allow payment after all other creditors have been paid. Even if Norcross Hospitality were entitled to a general unsecured claim as a matter of right, the Court will exercise its authority under Section 510(c) to subordinate its claim to that of all other creditors. For the foregoing reasons, the Court concludes Norcross Hospitality should be paid with available funds after all other claims, including administrative expense claims, tax claims, general unsecured claims, and Nilhan Financial's claim, are paid.

Norcross Hospitality requests that its claim include interest at 12 percent. It borrowed funds from Metro City Bank at 6 percent interest and then turned around and loaned the money to the Debtor at double that rate (12 percent). Norcross Hospitality states it should be allowed interest at the same rate (10 percent) as allowed to Rass. The Chapter 11 Trustee contends interest should be capped at the federal judgment rate. The Chapter 11 Trustee has approximately $8 million available to distribute in this case. After the funds are paid to other creditors, the remaining funds will not be sufficient to pay Norcross Hospitality's principal claim in full, so the Court need not determine what the appropriate rate of interest would be if additional funds were available.

## V. **Recharacterization**

Having determined that the Court will exercise its equitable discretion to allow Norcross Hospitality a distribution given the unique facts and circumstances of this case, the Court must

determine whether Norcross Hospitality's claim should be recharacterized as equity, as the Chapter 11 Trustee requests. Norcross Hospitality contends that recharacterization is not appropriate because the loan was documented, a third party lender was involved, Norcross Hospitality borrowed money from a bank to make the loan to the Debtor, and the value of the loan was correct and substantiated by the value of the property.

Bankruptcy courts can recharacterize debt as equity. In re First NLC Fin. Servs., 415 B.R. 874, 878-79 (Bankr. S.D. Fla. 2009) (citing Estes v. N & D Prop., Inc., (In re N & D Prop., Inc.), 799 F.2d 726 (11th Cir. 1986)). "Recharacterization is appropriate where the circumstances show that a debt transaction was 'actually [an] equity contribution [] *ab initio*.'" Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics), 269 F.3d 726, 747-48 (6th Cir. 2001) (quoting In re Cold Harbor Assocs., L.P., 204 B.R. 904, 915 (Bankr. E.D. Va. 1997) (alterations in original)). The issue to be determined in recharacterization is whether a "transaction created a debt or equity relationship from the outset." Cold Harbor, 204 B.R. at 915; see also Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys.), 432 F.3d 448, 454 (3rd Cir. 2006) ("the focus of the recharacterization inquiry is whether 'a debt actually exists.'") (quoting AutoStyle Plastics, 269 F.3d at 748); In re Hedged-Invs. Assocs., Inc., 380 F.3d 1292, 1298 (10th Cir. 2004) (applying multi-factor test "to distinguish true debt from camouflaged equity"). Recharacterization prevents an equity investor from labeling its contribution as a loan and subverting the Bankruptcy Code's critical priority system by guaranteeing itself a higher priority—and a larger recovery—should the debtor file for bankruptcy. In re Dornier Aviation (N. Am.) Inc., 453 F.3d 225, 231 (4th Cir. 2006). Thus, the "exercise of th[e] power to recharacterize is essential to the implementation of the Code's mandate that creditors have a higher priority in bankruptcy than those with an equity interest." Id. at 233.

The Eleventh Circuit has stated shareholder loans may be deemed capital contributions in one of two circumstances: where the trustee proves initial undercapitalization or where the trustee proves that the loans were made when no other disinterested lender would have extended credit. N & D Prop., 799 F.2d at 733 (citing In re Multiponics Inc., 622 F.2d 709 (5th Cir. 1980)).  Courts considering claims for recharacterization in the Eleventh Circuit have often applied an extensive set of criteria set forth in In re Lane, 742 F.2d 1311, 1314 (11th Cir. 1984), although Lane involved the question of whether a transfer constituted a debt for purposes of the bad debt deduction under 26 U.S.C. § 166.  See Ellinger v. United States, 470 F.3d 1325, 1333-34 (11th Cir. 2006) (citing Lane, 742 F.2d at 1314-1315).  The factors are:

> (1) the names given to the certificates evidencing the indebtedness;
> (2) the presence or absence of a fixed maturity date;
> (3) the source of payments;
> (4) the right to enforce payment of principal and interest;
> (5) participation in management flowing as a result;
> (6) the status of the contribution in relation to regular corporate creditors;
> (7) the intent of the parties;
> (8) 'thin' or adequate capitalization;
> (9) identity of interest between creditor and stockholder;
> (10) source of interest payments;
> (11) the ability of the corporation to obtain loans from outside lending institutions;
> (12) the extent to which the advance was used to acquire capital assets; and
> (13) the failure of the debtor to repay on the due date or to seek a postponement.

Lane, 742 F.2d at 1314-15.  These factors are not rigid rules; rather, they are meant to be helpful guidelines to be considered and weighed by the court.  Id. at 1315.  Additionally, a court is not bound to consider all of these factors; it needs to weigh only those factors that are relevant to the particular transaction.  Id. ("[w]e review the relevant [factors] well aware that '[e]ach case turns on its own factors; differing circumstances may bring different factors to the fore.'"); see also Celotex Corp. v. Hillsborough Holdings Corp. (In re Hillsborough Holdings Corp.), 176 B.R. 223,

248 (M.D. Fla. 1994) (explaining "[a] court is not required to examine all factors, and the facts of each case will help dictate those factors most relevant to a court's inquiry.").

The "determinative inquiry in classifying advances as debt or equity is the intent of the parties as it existed at the time of the transactions." SubMicron Sys., 432 F.3d at 457. How a transaction is labeled—as payables, for example—may evidence the parties' intent to treat the advances as loans. Celotex, 176 B.R. at 248 (citing U.S. v. Fidelity Capital Corp., 920 F.2d 827, 838 (11th Cir. 1991) (holding that under Georgia law, entry on the corporate books of a loan is sufficient formality to characterize the obligation as a loan)). The lack of a promissory note or absence of a fixed repayment schedule, in conjunction with lack of other formalities, may indicate that advances are equity contributions. Celotex, 176 B.R. at 248 (citing Mixon v. United States, 464 F.2d 394, 403 (5th Cir. 1972)). But, if evidence shows an advance otherwise complies with normal business practices and arm's length dealing, a court may properly characterize the advance as a debt. Celotex, 176 B.R. at 248; see also In re Blevins Concession Supply Co., 213 B.R. 185 (Bankr. M.D. Fla. 1997) (finding repayment terms were indicative of a loan). Similarly, the inability of the corporation to obtain loans from outside lending institutions may point to an equity transaction. In re 431 W. Ponce De Leon, LLC, 515 B.R. 660, 685 (Bankr. N.D. Ga. 2014) (Ellis-Monro) (that a commercial lender would not have made a loan to the debtors to fund the transactions weighed heavily in favor of recharacterizing the insider loans).

The Court finds that the factors weigh against recharacterizing Norcross Hospitality's interest as equity. For one, the Debtor obtained funds to exercise the option not only from Norcross Hospitality but also from an outside lending institution, Rass. While Norcross Hospitality is an insider of the Debtor, Norcross Hospitality is nevertheless a separate and distinct entity from the Debtor. No one has presented evidence to support consolidation or piercing the corporate veil and,

unless and until such evidence is presented, the Court must respect the corporate separateness of the entities. Norcross Hospitality argues it never intended the loan to be an equity contribution and that it borrowed real money from an outside source to in turn loan to the Debtor to exercise the option. The evidence shows Norcross Hospitality obtained the funds it loaned to the Debtor from Metro City Bank and signed a promissory note in favor of the bank. When Norcross Hospitality in turn leant the funds to the Debtor, the Debtor executed a promissory note and a deed to secure debt (though it was never recorded) in favor of Norcross Hospitality. The note provided for interest and a fixed maturity date. These facts suggest the advance was not intended to be an equity contribution. The Court declines to recharacterize the loan as equity.

**VI. <u>Conclusion</u>**

The Court recognizes that Norcross Hospitality provided funds used by the Debtor to reacquire the Property. But the Debtor did not seek approval from the Court to borrow funds from Norcross Hospitality or to exercise the option and purchase the Property. The principals of Norcross Hospitality are also the principals of the Debtor and the manager of each is Chuck Thakkar. No excuse exists for the Debtor's failure to obtain approval. The Debtor did not inform or consult its counsel. The Debtor and Norcross Hospital did not take these actions to benefit the creditors. When the transaction was discovered by the Court, the response of the Debtor was that the property had no benefit to creditors and should just be transferred to Norcross Hospitality. The actions of the Debtor and Norcross Hospitality do not comply with the bankruptcy code and do not justify the award of an administrative expense claim. Nevertheless, because all creditors will be paid in full, Norcross Hospitality should be paid with available funds after payment of all

creditors.  The court will therefore use its equitable power and direct that Norcross Hospitality's

principal claim of $5,169,212.32 be paid to the extent funds are available after all creditors are

paid.

**<u>END OF DOCUMENT</u>**

**Distribution List**

Henry F. Sewell, Jr.
Law Offices of Henry F. Sewell Jr., LLC
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305

David Weidenbaum
Office of the U.S. Trustee
Room 362
75 Ted Turner Drive, SW
Atlanta, Georgia 30303

Lisa Wolgast
Frank W. DeBorde
Morris, Manning & Martin LLP
3343 Peachtree Rd., N.E., Suite 1600
Atlanta, Georgia 30326

Paul Reece Marr
Paul Reece Marr, PC
300 Galleria Pkwy NW
Suite 960
Atlanta, Georgia 30339

Ronald L. Glass
Suite 110
3391 Peachtree Road
Atlanta, Georgia 30326

Walter E. Jones
Balch & Bingham LLP
30 Ivan Allen Jr. Blvd. N.W., Suite 700
Atlanta, Georgia 30308

John A. Moffa, Esq.
Moffa & Breuer, PLLC
3081 E Commercial Blvd., #204
Fort Lauderdale, FL 33308

M. Denise Dotson
M. Denise Dotson, LLC
PO Box 345
Avondale Estates, GA 30002