# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ALTANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| | : | |
| NILHAN DEVELOPERS, LLC | : | CASE NO. 15-58443-WLH |
| | : | |
|    Debtor. | : | |
| _____ | : | |
| | : | |
| NILHAN DEVELOPERS, LLC, | : | |
|            Plaintiff, | : | |
| v. | : | |
| | : | |
| Ronald Glass, Solely as Trustee of the | : | |
| Bankruptcy Estate of NILHAN | | |
| DEVELOPERS, LLC, and  RASS | : | |
| ASSOCIATES, LLC, a Georgia Limited, | : | |
| Liability Company, | | |
|            Defendants. | : | |
| _____ | : | |

## COMPLAINT TO DETERMINE OWNERSHIP OF REAL
## PROPERTY ALLEGEDLY SOLD BY THE BANKRUPTCY ESTATE

The Debtor[1] through its Interest Holders, Rohan & Niloy Thakkar, by and through the undersigned counsel, file this Complaint to Determine Ownership of Real Property Allegedly Sold by the Estate and state as follows:

1.    On June 25, 2019 the Trustee for the Estate filed a Motion of Chapter 11 Trustee for Orders (I)(A) Approving Bid Procedures for the Sale of Certain Property, Including Certain Bid Protections and Use of Stalking Horse Bidder and (B) Scheduling a Sale Hearing and (II) (A) Approving the Sale of Certain Property of the Estate Free and Clear of Liens, Claims, Encumbrances and Interests, and other relief pursuant to

---

[1] In this Complaint the "**Debtor**" is defined as the holder of assets which are no longer property of the **Bankruptcy Estate** as differentiated from the former **Debtor in Possession (DIP)** or the current **Bankruptcy Estate**, for whom Ronald Glass serves as Trustee (**Estate**).

§§105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 6004, 6006, 9006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure, of certain property owned by Debtor Nilhan Developers, LLC ("Debtor"), located at 2800, 2810, 2812 and 2814 Spring Road, Atlanta, Cobb County, Georgia, known as Emerson Center (Property), (Sale Motion).

2. The Plaintiff asserts that the "Debtor" (as described in the Sale Motion) did not own said Property and that any related "sale" is without effect, as asserted hereinbelow.

### Jurisdiction

3. This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. §§157 and 1334.

4. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and the Court may enter a final order consistent with Article III of the United States Constitution.

**FACTS REGARDING THE SALE OF THE DIP'S REAL PROPERTY**

6. On May 4, 2015, Nilhan Developers, LLC, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code initiating this case and thereby creating the DIP.

7. On April 11, 2017 [Case No. 15-58440, ECF. 634] the DIP filed a motion to sell the Property for $7 million to Westplan. The contract for sale called for certain adjustments to the purchase price. The DEP sought Court authorization of the

sale to Westplan Investors Acquisitions, LLC ("Westplan"), free and clear of any liens pursuant to 11 U.S.C. § 363.

8. On April 19, 2017 a supplement was filed which included the site plan. The supplement to the motion also included an "Assignment of Standard Form Contract of Sale" (Contract) representing that Westplan had assigned all of its rights and interests under the Contract to another entity known as Accent Cumberland Apartments, LP ("Accent"), on April 6, 2017. Under this assignment, Accent assumed all of the obligations and liabilities of Westplan under the Contract.

9. Included in the Contract was paragraph 26 entitled "Buy Back". The Court authorized the sale of DIP's real property for $7,200,000.00[2] to Westplan.

10. On April 28, 2017, the Court entered an order approving the sale to Accent which sale was consummated on May 1, 2017, after which date, the DIP had remaining assets valued at less than $160,000 (cash and fixed assets).

11. The Buy Back authorized the Debtor to repurchase by a specific date and time, measured by the Buyer's actions, which became August 20, 2018 at 5:00 pm for the Buy Back for the amount of $9,269,212.32.

---

[2] Hearings were held April 24, 2017 and April 27, 2017 on the motion to sell to the Property. The Court took testimony from a representative from the Buyer and from Mr. Thakkar regarding the proposed sale, the proposed rezoning of the Property, and the potential Buy Back provision. The Court heard testimony regarding the potential value of the Buy Back provision. Since a secured creditor, Bay Point, wanted to credit bid at the sale, the Court allowed an auction. Ultimately, Bay Point offered $7.3 million to the estate for the Property, but without the Buy Back option, while Accent offered only $7.2 million to the Estate including the Buy Back option. The Court was faced with deciding whether to grant the Debtor's motion to sell to Accent or to deny the motion because Bay Point offered a greater value. The Court found that once the Property was rezoned to accommodate residential and hotel use, the Buy Back option could have a value of $1 million or more. However, if the Property was not rezoned, the option likely had a zero value. The Court stated, "The bidding suggests to me that it's [the Buy Back option] worth no more than $100,000". The Court noted that the option was "clearly important to Mr. Thakkar", so the resolution was for Mr. Thakkar to pay the additional $100,000 so the estate and Bay Point would not be prejudiced. . . ". Thereafter Mr. Thakkar paid the DIP the $100,000.00 from non-DIP funds for the Buy Back Option.

12. The evidence presented to the Court at a hearing was that with less than 15 minutes remaining prior to the expiration of the Buy Back Option, Norcross' management was able to obtain the financing needed to allow the Debtor to exercise the Buy Back Option.

13. The testimony from the June 23, 2020 hearing was that Norcross was represented by counsel in exercising the Option, who was familiar with bankruptcy law. The DIP's attorneys were not included in the exercise of the Option and, since the DIP had administered the Property, said property was no longer property of the estate.

14. The attorney for Norcross testified he was aware of the DIP's bankruptcy case and did not believe bankruptcy court approval was necessary in order to allow the Debtor to exercise the Buy Back Option.

15. The testimony proved that the loan to Norcross, coupled with a loan from Rass Associates was sufficient to allow the Debtor to exercise the Option, which pursuant to Georgia Law and pursuant to the Bankruptcy Court's instructions, was paid for by Mr. Thakkar. Such Option's exercise allowed the Debtor to repurchase the Property from Accent[3] which was conveyed to the Debtor by Quit Claim Deed, dated August 22, 2018 and recorded at Deed Book 15566 Page 141, on August 24, 2018 at 1:30 PM, EDT.

---

[3] It should be noted, and is cited herein below, that under Georgia Law ". . . the doctrine of merger voids the purported grant of a covenant running with the land. The covenant, although contained in the unrecorded contract of July 2, 1981 for sale of Lot 16, was not included in the July 27, 1981 warranty deed to Lot 16. See Plaintiffs' Exhibit 14 (deed); Defendant's Exhibit 1 (sales contract). This is in contrast with the right of first refusal which both the sales contract and the Lot 16 deed described. In addition, **the contract did not contain a survival clause stating that the contract provisions survived the closing which might have prevented the application of the merger rule.** See Gray v. Lynch Contractors, Inc., 156 Ga. App. 473, 274 S.E.2d 614 (1980)". In re Jenkins, 74 B.R. 440, (Bankr. N.D.Ga. 1987).

16.     It should further be noted that the conveyance by Accent to the Debtor, based upon the State of Georgia's recognition of the doctrine of merger, would not have compelled Accent to consent to the conveyance to the Debtor.

17.     The testimony in the Bankruptcy Court also proved Norcross was not sitting on the money necessary to assist with the financing necessary to exercise the Option, but that Norcross, using its own credit and expertise was able to secure a loan. At the point the Debtor purchased the Property, the Property and the underlying "Option[4]" were no longer property of the Bankruptcy Estate.

18.     It was the Debtor, through Mr. Thakkar, that saw the potentially fully-encumbered asset (by Rass Associates and Norcross mortgages/loans totaling the Option price of $9,269,212.32), as having additional value.  Debtor's management believed was worth more money than the Buy Back price.

19.     Exercising the Buy Back required that the real property, then owned by Accent, be conveyed to the Debtor and pledged as collateral to Rass Associates and Norcross.  The DIP's only asset then was cash($24,938.58), but the Debtor's purchase vested fully encumbered Property in it which, having paid the Estate an additional $100,000.00 to purchase would inure to the benefit of the purchaser of the Option, Mr. Thakkar[5] on behalf of the Debtor, not on behalf of the DIP.

20.     The Court and the United States Trustee, apparently believing the DIP incurred debt to exercise the Buy Back Option and somehow added the Property into

---

[4] Which merged with the Deed.
[5] The Bankruptcy Court was quite explicit that in order to have the buy back provision approved by the Court, Mr. Thakkar needed to pay the DIP or the secured creditor of the DIP, the sum of $100,000.00.  Thakkar assigned his right to the Option to an affiliate who was able to raise the money and to whom the Option inured.

the DIP's estate never seemed to further analyze the transaction and the rights of the DIP and the rights of the Debtor.

21. However, since the DIP administered the Property, it was no longer property of the Bankruptcy Estate, it was property of the Debtor subject to the recorded mortgage and note of Rass Associates and subject to a mortgage and note to Norcross, which was not properly recorded in the office land records of Cobb County..

22. Probably believing the DIP's management breached its fiduciary duty to the Estate, on December 11, 2018, pursuant to § 1104[6], the Court entered an order granting the appointment of a Chapter 11 Trustee (ECF #919) and an Order approving the appointment of Ronald L. Glass as the chapter 11 trustee, thereby removing the DIP and substituting a Trustee for administration of Estate property. (ECF # 922.[7])

**AFTER THE APPOINTMENT OF THE TRUSTEE**

23. On April 2, 2019, the Court entered its Order Authorizing the Trustee to Employ CBRE, Inc. ("CBRE") as Real Estate Broker (ECF 1011)

24. CBRE marketed the Property for sale and received twelve offers from third parties interested in purchasing the Property. Thereafter, CBRE requested that all interested third parties submit their "best and final" offer, with no contingencies for zoning or otherwise, to which five (5) offers were received. The offer of Habersham Partners, LLC ("Buyer") was the highest and best offer.

25. The Estate and Buyer executed an Agreement for Purchase and Sale of Property dated June 24, 2019 , relating to the sale of the Property.

---

[6] All references hereinafter which only refer to a § are intended to refer to 11 U.S.C. §, unless another Title of the United States Code is specifically designated otherwise.
[7] During most relevant portions of this case, the case was Jointly Administered, under Case Number 15-58440.

26. In the Sale Motion the Estate asserted the Property was not encumbered by any liens, other than that certain Deed to Secure Debt and Security Agreement dated August 20, 2018 executed in favor of ("Rass Associates"), recorded on August 24, 2018 in Deed Book 15566, Page 1414, Cobb County, Georgia public records, securing indebtedness owed to Rass Associates pursuant to that certain Secured Promissory Note dated August 20, 2018 in the original principal amount of $4,100,000.

27. The Estate proposed that the Property is to be sold on an "As Is, Where Is" basis free and clear of all liens, claims, interests and encumbrances, and that any state, county, city or other ad valorem property taxes and assessments be paid at closing. Still, whether the Estate owned the Property was just assumes, but not litigated.

28. The material terms of the sale referenced immediately above were:

   a. Buyer would purchase the Property for $10,000,000.00 adjusted by prorations provided in the Agreement and reduced by the Earnest Money. The Trustee believed the price was fair and reasonable for the Property.

   b. Buyer would make a $500,000.00 deposit within three (3) days of execution of the Agreement with certain rights retained by the Estate and the Buyer.

   c. Closing to occur on or before one Business Day following entry of the Sale Order, but in no event later than July 26, 2019.

    d. The Sale would be free and clear of and not subject to any liens, claims, encumbrances, or interests of record and the Sale Order shall provide that the Property is free and clear of and not subject to any open mortgages or security deeds.

    e. The Sale Order would provide that the Buyer was a good faith purchaser who would be entitled to the protections of §363(m) of the Bankruptcy Code (contingent upon adequate evidence to support such finding).

29. The Estate's Agreement also provided certain leases associated with the Property (the "<u>Leases</u>") would be assumed and assigned to Buyer at closing.

30. The Sale Motion continued citing the Best Interest of the Estate standard along with the "sale free and clear" language of § 363(f) procedures for the sale and other necessary language which should be in any Sale Free and Clear of Liens motion under § 363(f).

31. Everything up to this point is, as any seasoned attorney for the Estate would confirm, is in line with the expected protocol of a sale of Bankruptcy Estate Property. The problem is the Estate did not have any ownership interest in the Property it attempted to sell to the Buyer, as set forth hereinbelow.

32. Unfortunately, the Court the Estate and the Estate's attorneys started with the presumption that the Property was property of the Estate. This Complaint asserts that the title to the Property was never determined by this or any other Court and the "sale" of the Property by the Estate to the ultimate Court approved "Buyer" was without legal effect.

33. The Estate did not seek a Court determination that the Property was property of the Estate nor did the Court ever determine the Property was property of the Estate. The Plaintiff asserts the Buy Back was property of the Debtor and was effectuated and accomplished by the Debtor. The Court and the DIP and/or Estate never asserted that the Property was property of the Estate, other than by implication, allowing and/or trying to "sell' the Property.

34. Likewise, the Court never entered an Order or Judgment determining the Property was property of the Estate. Until recently, it appeared everyone connected with the Buy Back and subsequent "sale" of the Property just assumed it belonged to the Estate, without any legal reasoning or analysis.

35. While the execution of the notes and mortgages on behalf of the buy-back purchaser would have been advantageous to the DIP, further rulings by the Court indicated numerous times that it would not have permitted any borrowing by the DIP and would not have approved the repatriation of the Property into the Estate.

36. The appointed Trustee in this case purportedly sold by the Property for $12,795,000.00 to Rass Associates.

37. While the action of signing the note and mortgage to Rass Associates and Norcross were completed without Bankruptcy Court authorization, no one sought to buy the property back for the DIP. It was assumed the DIP repurchased the property, but the Court approved Sale to Accent but did not authorize the DIP to buy back the property, that right was given, intentionally or unintentionally, to the Debtor. Any attempt to buy the property by the DIP would have produced a negative result by

the Court and there is no question the DIP did not possess the financial wherewithal to buy the Property.

38. Further, it is first year real property maxim that the "contract mergers with the Deed". Georgia law recognizes this maxim and "Georgia courts have adopted the doctrine of merger in the construction of deeds and contracts to convey realty. *Augusta Land Co. v. Augusta Railway and Electric Co.,* 140 Ga. 519, 79 S.E. 138 (1913); *Holmes v. Worthey,* 159 Ga. App. 262, 266-67, 282 S.E.2d 919 (1981), aff'd, 249 Ga. 104, 287 S.E. 2d 9 (1982). When parties have contracted to convey land, this doctrine provides that all agreements, unless distinctly collateral, and terms contained in an antecedent sales contract are merged into and superseded by the subsequently delivered deed." *In re Jenkins,* 74 B.R. 440, (Bankr. N.D.Ga. 1987)

**Bankruptcy Law**

39. It is basic Bankruptcy Law that property of a bankruptcy estate remains property of the bankruptcy estate until abandoned or administered.

40. Since the real property was sold to Accent, the real property was no longer property of the DIP having been administered by the DIP/bankruptcy estate and sold pursuant to a properly entered Order by the Bankruptcy Court..

41. Pursuant to 11 U.S.C. § 554, regarding abandonment, states: (a) After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate. (b) On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate. (c) Unless the court orders

otherwise, any property scheduled under section 521(a)(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title. (d) Unless the court orders otherwise, **property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate**.

42.     The 10th Circuit Bankruptcy Appellate Panel stated that "Section 554 governs abandonment of property of the estate and provides three methods for abandonment of estate property: (a) after notice and hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate; (b) on motion by a party and after notice and a hearing, the court may order the abandonment of certain property; or (c) once a bankruptcy case is closed, any assets that have been properly scheduled, but not otherwise administered, are abandoned by operation of law." *Cook v. Wells Fargo Bank, N.A. (In re Cook),* 2012 Bankr. LEXIS 1764, (10TH Cir. B.A.P., 2012).

43.     Abandonment only removes the property abandoned from the Bankruptcy Estate and vests title back in the Debtor. "Property of the estate remains in the estate until it is administered, abandoned, or when the case closes (if the property has been disclosed). The Bankruptcy Court deemed the Claim abandoned in the Illinois Bankruptcy. When property is abandoned under Section 554, control over that property is revested in the debtor or the party with the possessory interest in it as if the bankruptcy never happened." (Footnotes omitted). *Boisaubin v. Blackwell (In re Boisaubin)* 614 B.R. 557, 562 (8th Cir. Bankr. App. Panel 2020).

44. "The standard regarding abandonment of estate property is set forth in 11 U.S.C. § 554. It provides that a "trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a)." This standard is disjunctive. *See In re Neill*, 1989 Bankr. LEXIS 2800, 1989 WL 1681501 (Bankr. S.D. Iowa Jan. 9, 1989). The estate's property includes pending lawsuits. *See In re Auto West, Inc*., 43 B.R. 761, 763 (Bankr. C.D. Utah 1984). The purpose of allowing abandonment is to protect the estate from the burden of having to administer property that will not benefit unsecured creditors. *In re Paolella,* 79 B.R. 607, 609 (Bankr. E.D. Pa., 1987)." *In re Wilton Armetale, Inc.,* 2020 Bankr. LEXIS 2274, (Bankr. E.D.Pa. August 25, 2020,)

45. "Upon abandonment under section 554, the trustee is divested of control of the property because it is no longer part of the estate. Thus, abandonment constitutes a divesture of all of the estate's interests in the property. Property abandoned under section 554 reverts to the debtor, and the debtor's rights to the property are treated as if no bankruptcy petition was filed . . . In any event, property abandoned under subsection (c) (scheduled but not administered property) is deemed abandoned to the debtor. . . .Usually, abandonment of property will end the court's jurisdiction to determine disputes concerning that property, unless the result of the dispute could have some effect on the bankruptcy case. . . ." *Collier at ¶ 554.02* See also *In re Dewsnup*, 908 F.2d 588, 590 (10th Cir. 1990), aff'd 502 U.S. 410, 112 S. Ct. 773, 116 L. Ed. 2d 903 (1992)" (Emphasis added).

46. In allowing the sale of the Property by the DIP "[t]he Court held hearings on April 24, 2017 and April 27, 2017 on the motion to sell to [Westplan] as well

as on several other motions filed by the Debtor and its affiliates in contemplation of the April 30, 2017 deadline to pay Bay Point in full. The Court heard testimony from a representative from [Westplan] and from Mr. Thakkar regarding the proposed sale, the proposed rezoning of the Property, and the potential Buy Back provision. The Court also heard testimony from a developer of hotel properties regarding the potential value of the Buy Back provision. Because Bay Point wanted to exercise its right to credit bid on the sale to [Westplan], the Court allowed an auction to be conducted during the hearing. Ultimately, Bay Point offered to pay $7.3 million to the estate for the Property, but without the Buy Back option, while Westplan offered only $7.2 million to the estate including the Buy Back option. The Court was faced with deciding whether to grant the Debtor's motion to sell to Westplan or to deny the motion because Bay Point offered a greater value. The Court's analysis is explained in its oral ruling. The Court reviewed the claims filed in the Debtor's case, which were minimal. While typically the interests of equity holders get little consideration in a bankruptcy case, where the value of the asset is sufficient to pay creditors in full and deliver value to the equity holders, the Court may consider the interests of the equity holders in making decisions. The Court found that once the Property was rezoned to accommodate residential and hotel use, the Buy Back option could have a value of $1 million or more. However, if the Property was not rezoned, the option likely had a zero value. The Court stated, "The bidding suggests to me that it's [the Buy Back option] worth no more than $100,000". The Court noted that the option was "clearly important to Mr. Thakkar", so the resolution was for Mr. Thakkar to pay the additional $100,000 so the estate and Bay Point would not be prejudiced . . . ". Pages 4-5 of ECF #10 in Case Number 18-05193-WLH.

47. Pursuant to §541(b)(1) property of the estate does not include any power that the debtor may exercise solely for the benefit of an entity other than the Debtor. The Court's approval of the Buy Back option was clearly for the benefit of Mr. Thakkar and required Mr. Thakkar to pay the DIP $100,000.00 for said option (the value the Court assigned to the Buy Back option). Thereafter, the DIP conveyed its interest in the Property to Westplan with Thakkar retaining the right to exercise the Option which he was required to purchase as a condition of the sale to Westplan.

48. For whatever reason, when the Debtor exercised the Buy Back Option, many parties assumed the Property was purchased by the DIP, not the Debtor. Upon learning the Debtor exercised the Buy Back Option, the Court expeditiously ordered the appointment of a trustee without explanation why the Debtor, rather than the DIP would need court approval to buy property which was no longer property of the DIP[8].

**Law on Property of the Estate vel non.**

49. Since the real property was property of the Debtor no Court approval of the Buy Back was necessary, yet the Chapter 11 Trustee inappropriately, with Court approval attempted to commandeer property of the Debtor and administer said Property for the Bankruptcy Estate.

50. As the Court was aware, it did not approve any borrowing by the DIP to Buy Back the Property and stated it would not have approved a Buy Back, yet everyone seemed to conclude the DIP somehow repurchased the Property for which

---

[8] One would assume the Court believed the option was exercised, inappropriately by the DIP, which cannot borrow or buy property without Bankruptcy Court Approval pursuant to §§ 364, 1106 & 1107.

Mr. Thakkar (or his assigns) were required to pay $100,000.00 for said repurchase option.

51. Many people in the case "jumped" to the conclusion that the Property was, once again, somehow repatriated into the bankruptcy estate. This is not what occurred nor was it intended to be property of the estate. The Estate did not have the right to repurchase the Property nor did it have the right to administer property, even with Court approval, but without a finding that the Property was property of the Estate.

52. Accordingly, the Debtor currently owns the Property, yet both the Estate and Rass Associates believe that somehow the Estate "sold" the Property to Rass Associates.

53. First year property law has a maxim that no one can convey a greater interest in property than he/she himself/herself has.

54. Neither the Estate nor Rass Associates had nor do they currently have legal title to the Property. The Debtor, as defined herein is and remains the legal owner of the Property who seeks declaratory judgment from this Court as such.

55. The Buy Back provision of the Standard Form Contract of Sale (Contract), approved by the Court (ECF #634, pages 11 – 24) at ¶ 26 States: "BUY BACK. Seller acknowledges that Purchaser intends to apply to rezone the Property to allow the development of a multi-use project on the Property and, as part of such rezoning, the Purchaser will obtain annexation into the City of Smyrna. After Closing, the Seller shall have the right to purchase a portion of the Property utilized for the proposed hotel, office and retail (as shown on the rezoning/annexation site plan attached and incorporated herein as Exhibit B) ("HOR Property") for $2,500,000.00.

Seller's right to purchase the HOR Property shall be valid for sixty (60), days from the date of final rezoning and annexation. Purchaser shall deliver notice to Seller of such final rezoning and annexation. If Seller fails to close and acquire the HOR Property within such sixty (60) day period, then Seller's right shall be null and void and Seller shall no longer have such right. If Seller acquires the HOR Property, Seller and Purchaser shall enter into joint development and master site agreement addressing common development issues, such as construction costs easements and maintenance costs. The rezoning and annexation shall provide the guidelines and framework for the joint development and master site agreement as determined by the Purchaser. The joint development and master site agreement shall designate the proportionate share of costs and expenses for each party based upon acreage within the proposed multi-use project, such costs and expenses shall include but not be limited to, those costs associated with engineering, architectural, geotechnical oversight, developing, grading and infrastructure (such as stormwater driveways, utilities and parking). The parties agree that such common development costs and expenses shall be escrowed at the closing of the HOR Property. Purchaser shall have the right to determine the contractors and service providers for the multi-family project.

Further, if after Closing Purchaser is denied rezoning and annexation by the applicable authorities, Seller shall have the right to purchase the Property for $7,750,000.00 plus costs and expenses set forth in the second paragraph of Section 7, as well as interest at a rate of fifteen percent (15%) compounded annually from the date of Closing. Seller's right to purchase the Property shall.be valid fort ninety (90) days from the date Purchaser was denied the rezoning and annexation. Purchaser

shall deliver notice to Seller of the denial of the rezoning and annexation. If Seller fails to close and acquire the Property within such ninety (90) day period, then Seller's right shall be null and void and Seller shall no longer have such right."

56. A review of the Contract reveals that the "Seller" was defined as Nilhan Developers, LLC, a Georgia limited liability company in the opening. The Contract sites the necessity of Bankruptcy Court approval in ¶ 8 of the Contract.

**COUNT I – DECLARATORY JUDGMENT - LEGAL TITLE OF THE PROPERTY**

57. The Plaintiff realleges the allegations contained in Paragraphs 1 – 56 above.

58. The Property allegedly sold by the Estate to Rass Associates failed to account that legal title to the Property vested in the Debtor and not the Estate.

59. The attempt to and effort of selling the Property from the Estate to Rass Associates was without legal effect.

60. Title to the Property vested into the Debtor when the Buy Back was effectuated by the Debtor.

61. The DIP and/or the Estate did not have the financial wherewithal to exercise the Buy Back Option, no Court approval was sought to exercise the Buy Back Option by the DIP and/or Estate, no Court approval was sought to incur debt on behalf of the DIP and/or Estate and the sale of the Property removed the Property from being property of the Estate because the /DIP had administered the Property which divested the DIP and/or Estate of any legal interest in the Buy Back

62. The Debtor, through its equity interests, obtained the right to Buy Back the Property from the DIP for the $100,000.00 price set by the Court.

63. The Estate had no legal to sell the Debtor's Property to Rass Associates and Rass Associates acquired nothing more than the Estate possessed, which was nothing, in relationship to the Property.

**WHEREFORE,** the Debtor along with Interest Holders, Rohan & Niloy Thakkar request that this Honorable Court find as follows: [1] the Buy Back was effectuated between Westplan and the Debtor; [2] Property allegedly sold by the Estate to Rass Associates did not convey legal title of the Property to Rass Associates; [3] the attempt to and effort of selling the Property from the Estate to Rass Associates was without legal effect; [4] Title to the Property vested into the Debtor when the Buy Back was effectuated by the Debtor and was not vested in the DIP or the Estate; [5] Mr. Thakkar and/or the Equity Interests exercised the Buy Back Option which was purchased from the DIP with Court approval; and, [6] the Estate had no legal interest in the Property to convey to Rass Associates and Rass Associates acquired no legal interest in the Property from the Estate.

**COUNT II – ALTERNATIVE RELIEF- DECLARATORY JUDGMENT**

64. The Plaintiff realleges the allegations contained in Paragraphs 1 – 56 above.

65. Notwithstanding the fact that there exists no evidence the DIP had the financial wherewithal to finance the Buy Back Option and in light of the fact that the Bankruptcy Court ruled it would not have allowed the DIP to borrow the monies necessary to exercise the Buy Back provision of the Contract, In the event the Court does not recognize the Debtor as the legal owner of the Property (even after requiring Mr. Thakkar, who assigned his interest, to purchase the Buy Back Option for

$100,000.00), it would be inequitable for the Estate to not only benefit from, what turned out to be a financially beneficial transaction, and to retain the $100,000.00 paid by assignee of Mr. Thakkar's Option, to the DIP.

**WHEREFORE,** the Debtor along with Interest Holders, Rohan & Niloy Thakkar request that in the event this Honorable Court does not find the Debtor to be the title holder to the Property, as pled in Count I above, that the Estate be required to pay Mr. Thakkar and/or his insiders or affiliates or and enter judgment against the Estate and Order the immediate payment of $100,000.00 with applicable interest to the entity which remitted the $100,000.00 to the DIP and/or Estate for Mr. Thakkar's option interest, as assigned.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the **foregoing** was served on this 12th day of January 2021 via this Court's CM/ECF Electronic Service.

/*s/ John A. Moffa*[9]

| | |
|---|---|
| John A. Moffa, Esq. | M. Todd Westfall, Esquire[10] |
| Moffa & Bierman | Westfall, LLC |
| 3081 E Commercial Blvd., #204 | 4994 Lower Roswell Rd, Suite 6 |
| Fort Lauderdale, FL 33308 | Marietta, GA 30068 |
| Telephone: 954-634-4733 | Direct:   678-384-7005 |
| Fax:  954-337-0637 | Fax: 678-384-7020 |
| Email: john@moffa.law | Email:   twestfall@westfall-law.com |
| Fla.BN: 0932760 | Web:   www.westfall-law.com |

A Summons will be requested and Service of the Summons and Complaint will be made, pursuant to Fed. R. Bankr. P. 7004, to the Defendants and a Certificate of Service will be provided to the Court.

---

[9] Pro hac Vice
[10] Local Counsel